Next one, United States v. Livoti. Okay, Mr. Lecluge, we get to hear from you again. It's a busy morning for you. Thank you, Your Honor. Anthony Livoti, as the defense case showed, was a highly regarded, popular, scandal-free, ethically fine lawyer in Broward County. He was beloved by his client, the Florida Police Benevolent Association, one of whose, a witness from that organization came and testified for him at trial, that they continue to have full faith in him. He's always been honest. So we start out with a person that is in a business, the law business, has his own law office, and has, for him, other clients that produce much more income to him than this account in which he occupies a trustee role, a narrower role. In other words, he doesn't have to do litigation, he doesn't have to do intensive research about laws and that sort of thing. He has a fixed, retainer to serve as an independent trustee. And his primary responsibility as his independent trustee in this business, and I don't know that, sometimes when you give a name to something, it actually adds less clarity to it than not giving a name to it. But this business was basically reselling insurance policies. People would be able to get the value of their insurance policy by selling it to a company, Mutual Benefits. And Mutual Benefit was, they got the value of their insurance policy, and another person then could buy the policy and get the benefit when the original policyholder died. Mr. Livodi's obligation, his chief fundamental obligation, was to make sure, A, that those policies stayed in effect, and B, when the original policyholder died, the payment went out to the owner of the policy. That's why they had a trustee in there. They didn't want, and he fulfilled that function as far as the record shows, perfectly. If his job is to make sure the payments get made, when you have somebody who lives longer than expected, then the way I understand these policies, when you have somebody who lives longer than expected, and you have to pay the person who pays normally to work, the person is told, you want to keep this policy, you have to now make some additional payments. But that kind of thing didn't happen here, right? He just paid, there were no additional payments made. The investors put up the premium amounts up front, and there were never any additional premiums collected for the policies where the person lived longer than expected, is that correct? Exactly, and that's why one of the first steps toward understanding that the whole prosecution of this case, under the label of Ponzi, is completely wrong. This is not a Ponzi. You just said that his responsibility was making sure the premiums were paid. And they were. All right. They weren't paid by the holders of the policies. They were never intended to be paid by the holders of the policies. So what happened here was, premiums that came in for new policies were paid out on old policies. How else are you gonna pay them if the beneficiary's not coughing up new money? And 70 to 80% of these things are, where you had an estimate of death that was incorrect. I'm just trying to figure out what you meant by, his responsibility was paying the premiums on these policies. His responsibility was making sure the policies on the premiums were paid. And his responsibility was, when the policies became due, became payable, to make sure the payments went out. So this is what he did. What Your Honor's saying is that, at a certain point, the company started to, it started to be a bad business investment for the company. And at a certain point, there is some evidence that the defendant understands that at least as to some of the older policies, they're not paying out, that the people are living longer than expected. He's warned by more than one person, Amir Khan, he's warned by Harry Solomon, among others, that there's a premium deficiency problem, that he could be committing a crime by paying the premiums for one out of another's, investor's obligation. He knew what the problem was, right? I'm not exactly sure to what extent the testimony of what Solomon is saying could be a crime or not, came in for that purpose, or was admitted for that purpose, to the extent that exists. But it is not a crime. It was not, this is the problem with, when you impose a superstructure of Ponzi on top of a business, it doesn't turn the business into a Ponzi. This was more like, this is a people buying an insurance policy. Everybody knew that as to any given policy, somebody might outlive it. Everybody knew that, although we thought the odds were low, that everybody could start living to be 150 years old, and these policies would become very problematic. The company's obligation, it was the company that was at risk, and the company had to deal with it in that way. But the notion that there was, as in fraud cases, some statement to an investor that says, you have your own account, and your account is separate, and I will make sure that your money stays in trust, and that no money other than the money that you paid initially for this policy will go into the payment of premiums, that never occurred, because that would have been an impossible business. And everybody knew that. After Mr. Solomon told him there was a problem, I thought he continued to tell investors that there was enough, that they had plenty of money in this pension, in this fund, I don't know whatever you call it, to cover the premiums, and they had never failed to make premiums, da-da-da-da-da-da. He kept the same sales pitch after he was warned. There's $20 million in one account. He never made a sales pitch. When asked for information, he gave truthful information. This is not, that's what I'm saying, this is business. This is not fraud, this is business. Let me ask another way, Mr. Klug. So you said he had a limited role as a trustee, but his role as trustee was defined by a written trust agreement, right? Yes. And the trust agreement requires that future premiums on a policy will be paid by the trustee from funds designated for the particular policy, right? That's what it says. He didn't do that. He didn't keep the funds separate so that future premiums could be paid for the particular policy, did he? No, but that policy, that terminology has to be read within the context of the actual business model. Well, but then he was told that he can't commingle those funds and he has to have separate accounts, and he continues to do that. What's wrong with what I said? He's not told he can't commingle. What he's told is the older policies, we, unbeknownst to anybody, and this is the core problem here. The fraud in this case is not how they deal with the fact that they need to keep the policies paid in order to make sure everybody gets paid. The fraud is not, that is not the fraud. The fraud in this case is that they lied about the, Joel Stanger lied about the life expectancies. And so it wasn't just, oh my God, it was a surprise and unexpected business development that we have to accommodate rationally, which is what Lavodi is operating under, but it was this massive fraud in towards getting people to invest in something that was misdescribed. People think they're buying into a horse race and they're buying into a greyhound race. So that's the distinction. What was the evidence about what he knew regarding how many people were living too long and how many policies? The evidence was in regard to, it comes back to the other question that your Honor asked, which is at a certain point, there became an expectation, a concern that the pool, and there was never a separate pool, there was never a separate policy by policy pool, and nobody ever said that there was, that the pool that they had originally accommodated for the older policies, that they should separate it out into a second pool because they were doing better life expectancy estimations for the second pool and that would protect them better. But at some point, he knew that there were a significant number of policies for which the person had lived longer than expected. What was the specific evidence about that? Again, there wasn't a lot of specific evidence other than the balance sheet. It's just the balance sheet. It wasn't specific to specific policy. I mean, it wasn't like, I don't think the evidence was that he had specific information that showed him anything about the underlying problem. And the problem was- Conversations with Lombardi, conversations with Solomon, conversations with Khan, none of this told him there was a problem. There was a business problem. None of this told him there was a fraud problem. And that's the whole point. When Lombardi then gets up on the stand, when- Business problem is 10 to 20% mistake about life expectancy. 70 to 80% sounds like something more than a business problem, right? Well, I don't know that it was, I mean, I don't know, the evidence does not show exactly what he was told. And the problem, again, with this evidence of the conclusory nature of the testimony is that it's backed up by this bolstering in many different ways. The problem is that he then is not acting as a neutral trustee when he promotes the product and says that there's plenty of money to pay the premiums when he knows darn good well there's not. And then you have these policies that have no value restrictions. He participates in fraudulent conduct to get around those restrictions. There's a lot more here than just a business problem, isn't there? I don't see, the no value problem, I think was addressed directly with the insurance companies and they backed down. So he actually did a service to everybody in that context. With regard to the knowledge of how the business. Second, that was, you're putting something in his column. They said, wait, you're listing yourself as the friend of these people so that contrary to the policies, it can be transferred. No value policy can be transferred. And so he's called on it and he scares them into backing down. That's a plus in his column, in your opinion. No, and again, whether he's guilty or not, he's not a bad man and what he did is not really a bad thing. I hope the court understands. These are people, mostly it starts out AIDS people. They need the money, they're dying.  It's true that he was listed as a friend when the policy was transferred in order to get the policies to overcome that limitation and the assignability of those policies. As to at least some of them, there was. But again, that's not the fraud that's charged in this case. That's dealing with the insurance company and how you're getting the value from the insurance company. That's not the frauding. But if your answer is that there's nothing to show that he knew anything was going, you're arguing that this is just purely business and there's no fraud. If you start having evidence of lying, misstatements, then at some point, it's not purely business. The friend issue was resolved. It was resolved as an appropriate way of dealing with it. It was not, again, that would be an issue as to Cigna. And Cigna, they confronted it, he fought about it with them, they backed down. I mean, that's not what this case was about. They had the Levati line. The Levati line, again, this is a classic indication of somebody who does not think that there is fraud going on. In other words, when the insurance company calls, they don't answer, oh, this is Mr. Levati's house. He's not in, he's in the restroom or whatever. No, according to the government, their proof that they're deceiving the insurance company by having this Levati line, which is, again, not part of the charge fraud in any event, is that they answer law offices. And why? Because he's getting paid so little and he's gotta pay for the overhead out of what he's getting. He's gotta pay for overhead for these people, so they're contributing some overhead by letting a line come into him. What is the line for? It's to let the insurance company know he's a lawyer. Okay, Mr. Kluge, we've let you go four minutes over. You'll save your five minutes for rebuttal, Ms. Cannon. Good morning and may it please the court. Eileen Cannon on behalf of the United States and seated with me at council table is Karen Rocklin, who served as one of the principal trial attorneys in the district court. Mr. Levati played a key role in a massive investment fraud that caused over $800 million in losses and harmed approximately 20,000 investors. This court should affirm his convictions and reject his claims on appeal. If I could turn first to the sufficiency issue, there is ample proof in the trial record of Mr. Levati's knowing participation in a massive fraud. And his fraudulent actions spanned various categories, starting first with his facilitation of the Ponzi scheme. He was informed within a very short period of time into the conspiracy that the chronic problem of premium reserves was getting worse and worse. He had direct conversations with Mr. P. Lombardi, who was one of the principals of NBC. He also was informed by Mr. Kahn, who was the president of VSI, the company that served the post-closing services for the policy. He also was told by Mr. Fernstrom, who worked at VSI as well. He then, as the years progressed, continued to be told by other individuals of the chronic problem. I think quite palpably, he was told by Mr. Solomon in the 2001 period that he had to cease making representations to investors regarding the status of his premium accounts until he got a full handle of the financial situation. And nevertheless, he continued to submit these kinds of bank statements to investors, representing that he had large sums of money in his premium accounts. And that, of course, was highly misleading because it gave the impression that the sufficiency of the reserves were sound and that the investments were safe. And he continued to do this. As late as October of 2003, he continued to request bank statements. And we have an email exchange making that request. So at this point, he has been informed by multiple individuals on multiple occasions, and yet he continues to violate his obligation as premium trustee and as fiduciary to these investors. Can I just have this post to work? The investor buys the policy, basically, and pays all the premiums upfront based on the life expectancy. I take it that's the way it works. So that if somebody dies early, there are premiums in the reserve fund that can be used to take care of the normal expectation that somebody may live longer. Is that how it's supposed to work? Yes, yes, correct. So, but what happened in this case is that for the first couple of years, no premiums were escrowed at all. And Mr. Lavodi served as escrow trustee during that period. So by the time he inherits the policy, so to speak, as premium trustee, he's already massively in the red. And people are aware of this problem and talking to him about it. Then when MBC decides to increase its life expectancy, excuse me, to one and a half times life expectancy, that still, there are never enough funds to cover the premium. And the problem is that because the viators are not, quote unquote, dying on time, the category of individuals that are dying prior to that life expectancy is so small that there is no, quote, general reserve fund. And so this is what prompts him to continuously transfer money from the escrows for new investors to pay for premiums on policies whose reserves have expired. And this happens throughout the course of the conspiracy and it becomes all too. Which is why it was described as a Ponzi scheme. Yes, and that is charged in the indictment and I think proven quite substantially at trial. Obviously this trial was lengthy over approximately 11 weeks long and there were multiple testimony, multiple witnesses who testified about this, both government witnesses and defense witnesses. And do I understand there were never any separate escrow accounts? That's correct. There were about four escrow accounts, but they were treated, and Mr. Lavodi openly admits this in his deposition taken in the SEC action, that he was treating this as, quote, one pot of money. And he was essentially just cutting checks from that large fund indiscriminately without knowing what was actually tied to any particular policy. And there were no sub-accountings for any of the particular policies. So he acted quite blatantly in his actions and never once disclosed to investors that the premium reserves were dwindling, were non-existent basically, and he never disclosed to investors a series of other material risks that accompanied the policy, such as what your honors were describing in the gift assignments. I'm gonna ask, after 2001, what exactly was his relationship to the investors? What did he, how did he interact with investors? Well, his role formally remained the same as premium trustee, that did not change. In terms of his face-to-face interaction with investors, we know at a minimum, for example, he's requesting bank statements to submit to agents and brokers. We know this as late as October 2003 when he's requesting bank statements to then disseminate to those brokers and agents. We also know Mr. Lombardi testified about a sales seminar in approximately 2003 or 2004, during which Mr. Lombardi showed investors a copy of the bank statements. Again, misleading with what appeared to be a large sum of money, when in reality it masked the premium obligations that were coming due. So his role remained the same and the lies only became worse and worse because the situation was dire. What evidence do we have of what he said at those sales seminars? He showed in the statements. Mr. Lombardi, let me see here. This Lombardi testimony? Yes, this is at page 30 of the government's brief. Lombardi stated that around 2003 and 2004, during one of NBC's monthly sales seminars, in which Lavodi and NBC's other principals participated, Lavodi showed investors a bank statement for his premium account, showing something in the order of $20 million. This is at docket entry 1091, pages 180 to 181. And Lombardi testified that this, quote, surprised him because he knew, and Lavodi knew, that there was, quote, always questions if there was enough money in the premium account. And there were serious deficits in the premium balances at that time. And this is after he had had a series of conversations about the problem in the premium accounts. So this is a fraud. This is not just simple business dealings. And he did not serve as a, quote, ethically fine lawyer. He lied to investors repeatedly with a series of material misrepresentations and omissions. And that is why the jury, over a lengthy trial, properly convicted him on the four counts of conviction. If your honors have no further questions regarding this case, we respectfully ask that you affirm his convictions and reject his claims on appeal. Thank you. Thank you, Ms. Cannon. Mr. Kluge, you have five minutes. Again, the government, in asserting the sufficiency, relies on Peter Lombardi. Our brief focuses very heavily on Peter Lombardi and the incredible improper links that the government went to wrongly bolster Peter Lombardi's testimony, for example, as well as McNerney's testimony, as well as others. The notion that Lavodi, by stating accurately what the bank balances are, should be convicted of this conspiracy is novel. It may sound good to the government, but it's novel. He's making truthful statements to the investors. Lombardi comes back and says, well, he should have told them that we think, even though that's a lot of money, we don't think it's gonna be enough because we think things are gonna be worse. Why is he supposed to say that? Because Lombardi says so five years later? Because Lombardi says, you know, why? That's, what he says is, this is, I'm not in the business part of it. What do I handle? I handle the money. This is how much money we have. And the notion that pooling of assets, again, pooling of assets is supposed to be criminal. Harris Solomon, the witness that they come in is supposed to be the golden witness. He says, yes, pool assets, but have two pools instead of one. It cannot be the pooling of assets. It cannot be that. This is not that type of case. It's not a trustee who takes money from one people to give to another people. No, that's not it. The pooling of assets is not the problem. The problem is that the life expectancies were not right. The business model was not working. And while some businesses have problems and get over them, some businesses have problems and don't get over them. And that's, this is a business that we don't know whether it was gonna get over it or not. The state came in and they found extraneous fraud and stopped the business. Had it not been for the extraneous fraud, Lombardi would have been right. There would have been enough money. It would have been no problem. But these people were siphoning off extra money, completely unknown to him, not a single suggestion to him that he's supposed to be paying. That when he got first started with this, he receives the money and he doesn't receive anything in a general reserve fund. There's no, there's nothing. He starts this thing up with nothing. He has to have a reserve fund to pay the premiums for the expected extended life. So he has no fund. But Your Honor, respectfully, when he starts it, the government's not saying it was messed up then. They're saying that he never changed. They just said it was messed up then. When he came in that it was messed up, the only way it was messed up then is that nobody knew, or some people knew, he did not know that Joel Stenger was falsifying the life expectancy. He knows there's no reserve fund. There was not a problem. The problem developed over time. It did not, there was not a problem in year one. There was not a problem in year two. He did not, he's not doing anything wrong. Everything is- There's no problem in year one or two if you're using new investors' money to pay old premiums. Your Honor, I'd like to go back, and if necessary, file a supplement. Okay, so tell me that's not true. There was nothing facially wrong. Not a single witness said at the time he came in, looking at the accounts that he had, the monies that he was dealing with, that he should have known something was wrong. Nobody said that. Lombardi didn't say that. Lombardi's comment comes years later. Lombardi's comment, because things aren't working out. But the notion, people were buying policies. They weren't pre-paying premiums. They were buying policies. It was an investment. You buy a policy, we take the risk and pay the premiums. That's it. If the premiums go beyond what you contributed, that's too bad. It's our problem. If they go below what you paid, we make money. That's it. It wasn't the same as this other model. The monies were pooled. Who said, years later, well into this thing, Harris-Solomon, their big expert, says, yeah, pool. Pooling is good. Pooling is great. You can't make it. It's like paramutual betting. You can't treat every bet on a simple thing like this. Some people are gonna live longer. Some people are gonna live shorter. Obviously, some policies are gonna pay for other policies. That's the nature of the game. It's how Justify paid 780 at the Kentucky Derby. That's not, as I understand it, what the argument is. The argument is he's told that there's a premium deficiency problem. That these folks are living longer than expected. Right, and the answer is what? And then he's touting to potential investors to keep the money going, that everything's fine, that he's got plenty to pay the premiums, that they should invest in this, and he's doing it to get new money to pay the old investors' premiums. That's what I understand the argument. Again, but they blow it way out of, he is not out there selling these policies. He's not out there, he's a sales pitch guy. Participates in the sales seminars, the promotional videos. He shows people bank accounts. He's involved in promoting, isn't he? He is not touting, he's not guaranteeing any returns. He's saying we have money now, we're solvent. Basically, he's saying we're solvent. And it's true. And it's just not the fraud that was charged in this case. If that's fraud, and I don't think it is, it's not what was charged. Much less does it prove the other counts. Much less does it prove money laundering. Much less does it prove count four and count seven, which I've heard nothing about through this entire appeal. Not a word about count four or count seven. One word about money laundering, it's a Ponzi scheme. I've never seen a Ponzi scheme like this where there are no returns, and yet it's still money laundering. When he pays out those biannuals, that's not money laundering. Okay, we have your case, Mr. Klug. We appreciate your argument. We'll be in recess until tomorrow morning.